IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

AMANGOUA J. BILE,

    Plaintiff,

v.                         Civil Action No. 3:15cv051

RREMC, LLC, and
DENNY'S CORPORATION,

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on a set of cross-motions: Defendants' MOTION FOR SETTLEMENT ENFORCEMENT (Docket No. 51) and Plaintiff's MOTION TO ENFORCE SETTLEMENT AGREEMENT (Docket No. 54). For the reasons stated below, Defendants' MOTION FOR SETTLEMENT ENFORCEMENT (Docket No. 51) will be granted and Plaintiff's MOTION TO ENFORCE SETTLEMENT AGREEMENT (Docket No. 54) will be denied.

## PROCEDURAL HISTORY

The current dispute arises out of an employment discrimination action filed by Amangoua J. Bile ("Bile") against RREMC, LLC and Denny's Corporation (collectively, "Defendants"). (Compl., ECF No. 1). The case was referred to a Magistrate Judge for settlement discussions. (ECF Nos. 23, 24). At the Settlement Conference, Bile was represented by Uduak Ubom ("Ubom") of the Ubom Law Group, and Defendants were represented by Olaolowaposi

Oshinowo ("Oshinowo") and Vijay Mago ("Mago") of LeClairRyan, P.C. ("LeClairRyan"). On July 21, 2015, the parties signed a Settlement Agreement (Def.'s Ex. 1) ("the Settlement Agreement") which stated in relevant part that:

> [w]ithin fifteen (15) business days of the Effective Date, RREMC shall pay and Bile shall receive a one-time lump-sum of SIXTY FIVE THOUSAND DOLLARS AND 00/100 ($65,000.00) ("Consideration"), made payable to Bile. This Consideration shall be paid as follows: (1) TWO THOUSAND DOLLARS AND 00/100 ($2,000.00) reflected on a W2 as wages; (2) SIXTY-THREE THOUSAND DOLLARS 00/100 ($63,000.00) reflected on a 1099 as compensatory damages. This Consideration shall reflect compensatory damages for Bile's claims and shall not be subject to withholdings by RREMC.
>
> Bile shall file with the United States District Court for the Eastern District of Virginia a Stipulation of Dismissal, with prejudice, except that the Court shall retain jurisdiction to enforce the terms of this Agreement. Pursuant to Kokkonen v. Guardian Life Insurance Co. of America, 511 U.S. 375 (1994), the Stipulation of Dismissal shall explicitly reserve such jurisdiction in this Court. The Stipulation of Dismissal is to be filed within ten (10) business days of the execution of this Agreement.

(Settlement Agreement at 1-2; Def.'s Post-Hrg. Mem. 4-5).

As discussed in more detail in the Court's findings of fact, the email used by Bile's counsel during the course of litigation, "ubomlawgroup@yahoo.com," was compromised. (E.g., Def.'s Post-Hrg. Mem. 2, 7-8, 18; Pl.'s Post-Hrg. Resp. 7-9). On

July 29, 2015 at 6:40 p.m., the third party that compromised the account sent an email from ubomlawgroup@yahoo.com to Oshinowo at LeClairRyan, instructing that the payment required by the Settlement Agreement be wired to a Barclay's account, purporting to be Bile's, in London. (E.g., Def.'s Post-Hrg. Mem. 2, 7-8, 18;  Pl.'s  Post-Hrg.  Resp.  7-9).    Oshinowo  initiated LeClairRyan's internal procedures for a wire transfer in the amount of $63,000.00 to be dispatched to the Barclay's account, and LeClairRyan initiated that transfer. (Def.'s Post-Hrg. Mem. 9). Meanwhile, Defendant RREMC, LLC processed a check for $2,000.00-less-witholding and mailed it to Bile's residential address.  (Def.'s  Post-Hrg.  Mem.  10).  Bile  received  the $2,000.00-less-witholding check without incident. (Def.'s Post-Hrg. Mem. 10).

On July 31, 2015, Bile's counsel, Ubom, called Oshinowo inquiring about the remaining $63,000.00. (Def.'s Post-Hrg. Mem. 6). At that point, Oshinowo learned that the July 29, 2015 6:40 p.m. email from ubomlawgroup@yahoo.com had not originated with Ubom, and LeClairRyan unsuccessfully attempted to claw back the wire transfer. Bile refused to dismiss this action, and Defendants refused to initiate another $63,000.00 payment. (Def.'s Post-Hrg. Mem. 12, 25; Pl.'s Post-Hrg. Resp. 13-14).

When the Magistrate Judge learned of the situation, he ordered the parties to brief the matter (ECF Nos. 27-30, 32-39)

3

and initiated a criminal investigation with the United States'
Attorney's Office for the Eastern District of Virginia. (ECF No.
40). In the course of this briefing, Defendants learned for the
first time that: (1) on July 27, 2015, Ubom had received an
email, purportedly from Bile, directing the deposit of the
settlement funds in the same Barclay's account to which
LeClairRyan subsequently transferred the $63,000.00; (2) Ubom
had called Bile to determine whether the email was not genuine,
and Bile had confirmed that the email was not genuine; and (3)
Ubom had deleted the email without informing Defendants,
opposing counsel, or the Court. (Def.'s Post-Hrg. Mem. 20; Pl.'s
Post-Hrg. Resp. 2).

The parties were unable to resolve the matter. The dispute
was then presented to the Court, which set a schedule for
motions to enforce the settlement and for an evidentiary
hearing. (ECF Nos. 46, 67, 69). The parties filed cross-motions
to enforce the Settlement Agreement and presented evidence. (ECF
Nos. 51, 54).

The briefing in this case originally centered on the
reasonableness of each side's actions. Following inquiry from
the Court respecting the issues to be heard at the evidentiary
hearing, the parties presented additional arguments rooted in
substantial performance, material breach, and certain aspects of
the Uniform Commercial Code ("U.C.C."). At the evidentiary

hearing, Bile also unexpectedly presented an argument that the Settlement Agreement did not correctly reflect the intent of the parties. Post-trial briefing followed.

At the evidentiary hearing, Defendants presented the testimony of David Melczer ("Melczer"), accepted by the Court as an expert in information technology, and James Lemmert, who carried out the wire transfer in question, in support of the Defendants' position that Oshinowo acted reasonably in transmitting the $63,000.00. (Def.'s Post-Hrg. Mem. 7; Pl.'s Post-Hrg. Mem. 10-11). Bile presented his own testimony and that of Oshinowo in support of the Bile's position that: (1) the Settlement Agreement was not enforceable as written; and (2) Oshinowo acted unreasonably in transmitting the $63,000.00.

**FINDINGS OF FACT**

In light of the evidence and testimony presented at the evidentiary hearings of June 16 and 22, 2016, the Court finds the following facts by a preponderance of the evidence.[1]

## A.    The Parties Signed A Valid Settlement Agreement

    On July 21, 2015, the parties signed a valid and binding Settlement Agreement which provided that Bile was to dismiss the action within ten days of execution and that Defendants were to

---

[1]    The burden required is discussed in greater detail in the Conclusions of Law.

pay Bile within fifteen days of execution. (Def.'s Ex. 1; Def.'s Post-Hrg. Mem. 4-5).

Bile's assertion that the parties intended to introduce alternate terms, namely, that Bile intended that Defendants pay him before he would dismiss the case (Pl.'s Post-Hrg. Mem. 2, 5),[2] is barred by the parol evidence rule. As Bile himself stated, during direct examination by his own counsel, the only discussion of the purported alternate terms occurred <u>prior to</u> the parties' signing the Settlement Agreement. (<u>E.g.</u>, Pl.'s Post-Hrg. Resp. 5-7). Under the parol evidence rule, evidence of inconsistent prior oral agreements is inadmissible to vary or augment the terms of an agreement where, as here, the contract in question is a written, integrated agreement.[3] Restatement

---

[2] Defendants deny that any such agreement to vary the terms of the Settlement Agreement took place. (Def.'s Post-Hrg. Mem. 5-6). It is unnecessary to evaluate credibility, because evidence of prior inconsistent terms is barred under the parol evidence rule.

Defendants also presented uncontroverted testimony to the effect that the order of performance was a material term that was specifically bargained for. (Def.'s Post-Hrg. Mem. 5-6). Such evidence related to an argument made in pre-hearing briefings that Bile materially breached the Settlement Agreement by seeking to return to work for Defendants and threatening to "appeal" in the time between execution on July 21, 2015 and LeClairRyan's initiation of the wire transfer on July 29, 2015. (<u>E.g.</u>, Def.'s Post-Hrg. Mem. 5-8, 15-16, 25). The Court finds it unnecessary to consider that argument to reach a decision in this case, and will not dwell further on that testimony or issue.

[3] The Court finds, pursuant to Restatement (Second) of Contracts § 213(b) that the Settlement Agreement is such an integrated

(Second) of Contracts § 213 (1981) ("Restatement");[4] see also
(Def.'s Ex. 1 at 5) ("This Agreement constitutes the entire
understanding between the parties. The Parties have not relied
on any oral statements that are not included in this Agreement.
Any modifications ... must be in writing and signed by Bile and
an authorized employee or agent of [Defendants]."). Bile's
argument that such statements should be admitted as evidence of
the "course of the dealings of the parties" are unavailing
because extrinsic evidence of prior or contemporaneous dealings
are admissible only to clarify ambiguous terms in an integrated
agreement, not to contradict clear terms in an integrated
agreement. E.g., Doswell Ltd. P'ship v. Virginia Elec. & Power
Co., 251 Va. 215, 222, 468 S.E.2d 84, 88 (1996); Brunswick Box
Co. v. Coutinho, Caro & Co., 617 F.2d 355, 357 (4th Cir. 1980).
The timing provisions in the Settlement Agreement are perfectly
clear and require no clarification. Hence, parol evidence is
neither necessary nor admissible to clarify the Settlement
Agreement.[5]

---

contract, examining the plain language of the "Entire Agreement"
clause. (Def.'s Ex. 1 at 5).

[4] Use of the Restatement as governing law is discussed in greater
detail below.

[5] Neither party presented evidence of an agreement, or even
discussion, made subsequent to the Settlement Agreement which
would have altered the terms of the Settlement Agreement.

7

Finally, Bile's assertion that the Settlement Agreement is not valid is irreparably undermined by his own motion to enforce that same agreement. (Docket No. 51). Having moved to enforce the Settlement Agreement, Bile cannot now assert that the Agreement as written is unenforceable.[6] Quite frankly, the Court cannot perceive how, having made the motion to enforce, Bile and his counsel can also argue in any good faith that the Settlement Agreement is unenforceable.

**B.  Ubom Received a Fraudulent Email**

On July 27, 2016, Ubom's business email account, ubomlawgroup@yahoo.com, received an email from an aoi.com account, which was visually similar to Bile's legitimate aol.com address. (Def.'s Post-Hrg. Mem. 20, 22; Pl.'s Post-Hrg. Resp. 2).[7] That email requested that the $65,000.00 settlement be wired

---

(Def.'s Post-Hrg. Mem. 26). As discussed at footnote 8, Defendants' early payment was not a subsequent alteration.

[6] Although Bile's conduct does not quite rise to the level of judicial estoppel because Bile did not state an inconsistent theory in prior litigation, e.g., Lowery v. Stovall, 92 F.3d 219, 224 (4th Cir. 1996), Bile's filing of the motion to enforce the Settlement Agreement on April 11, 2016 (Docket No. 51) greatly undermines his present claim (Pl.'s Post-Hrg. Mem. 2, 5-7) that the parties did not intend the Settlement Agreement as written to be binding. Bile's motion quite clearly reflects that Bile intended the Settlement Agreement to be enforceable as written.

[7] As discussed in greater depth at the conclusion of the findings of fact, the aoi.com email originated with a malicious third party.

to a particular Barclay's account in Bile's name in London. (Def.'s Post-Hrg. Mem. 20; Pl.'s Post-Hrg. Resp. 2). Ubom called Bile to ask if Bile had sent that email; Bile informed Ubom that he had not. (Pl.'s Post-Hrg. Resp. 2). Ubom deleted the email without notifying Defendants, Defendants' counsel, or the Court. (Def.'s Post-Hrg. Mem. 1-2, 10, 22; Pl.'s Post-Hrg. Resp. 2).

Bile's briefing states that neither Bile nor his attorneys had any reason "to believe the Settlement Agreement had been compromised or that there was potential fraudulent activity." (Pl.'s Post-Hrg. Resp. 1, 20). That assertion is irreparably, and dispositively, undermined by the statement in Bile's briefing that "[o]n July 27, 2015 Plaintiff's counsel received what he considered a fraudulent email" (Pl.'s Post-Hrg. Mem. 20) and the repeated statements in Bile's briefing that Ubom deleted the July 27, 2015 aoi.com email because of various bulletins regarding fraud. (Pl.'s Post-Hrg. Mem. 2-3, 20). Moreover, the undisputed record shows that Ubom told Bile about the fraudulent email. The Court finds that both Ubom and Bile had actual knowledge that, on July 27, 2015, a malicious third party was targeting this settlement for a fraudulent transfer to an offshore account that did not belong to Bile. The Court further finds that both Ubom and Bile knew the email account of the Ubom Law Group was implicated in that fraudulent activity.

## C.    **Bile Pushes for, and Defendants Send, Early Payment**

After signing the Settlement Agreement on July 21, 2015, Bile began hounding Defendants for an accelerated payment, even threatening to withdraw from the Settlement Agreement if he did not receive payment by July 31, 2015. (Def.'s Post-Hrg Mem. 15-16, 25; Pl.'s Post-Hrg. Resp. 6). Bile attempted to return to work for Defendants (which was explicitly forbidden by the Settlement Agreement), expressed that he was dissatisfied with the amount of the consideration, and expressed that he wanted to "appeal" the Settlement Agreement. (Def.'s Post-Hrg. Mem. 6, 15; Pl.'s Post-Hrg. Resp. 1, 7, 16, 26).

Defendants capitulated in the face of Bile's insistence that the payment date be advanced, and agreed to initiate payment on July 29, 2015, understanding that Bile wanted the consideration paid as quickly as possible and might attempt to rescind the agreement if he did not receive the $63,000.00 by July 31, 2015.[8] (Def.'s Post-Hrg. Mem. 5-8, 15-16, 25; Pl.'s

---

[8] Contrary to Plaintiff's argument (Pl.'s Post-Hrg. Mem. 6-7, 10, 15, 17, 27), this capitulation did not represent an amendment to the Settlement Agreement which would render the Settlement Agreement in evidence invalid. The Settlement Agreement required Defendants to pay within 15 days of July 21, 2015 (Def.'s Ex. 1 at 1-2). Thus, an early payment was clearly permitted by the Settlement Agreement. (Def.'s Post-Hrg. Mem. 5). Definitively, Bile concedes that "[p]aying the funds on July 31, 2015 was not outside the terms of the Agreement, because the Defendant had a duty to pay between July 21 and August 11, 2015 within the terms of the Agreement." (Pl.'s Post-Hrg. Resp. 16). Thus, making an early payment did not amend the contract.

10

Post-Hrg. Resp. 1-2, 4, 6, 9). Defendants acted as they did to ensure that the Settlement Agreement was effectuated.

On July 29, 2015, Ubom and Oshinowo discussed payment over the phone, and agreed orally that two checks – one for $63,000.00 sent by LeClairRyan and one for $2,000.00-less-withholding sent by RREMC, LLC – would be sent by FedEx to Bile at his residence in Virginia. (Def.'s Post-Hrg. Mem. 7-8; Pl.'s Post-Hrg. Resp. 1-2). Oshinowo expressed that it might be difficult to process the $63,000.00 check to Bile as quickly as Ubom and Bile desired. (Def.'s Post-Hrg. Mem. 7-8; Pl.'s Post-Hrg. Mem. 9). Ubom and Oshinowo agreed, orally, that Ubom would send confirmation of Bile's residential address to Oshinowo by e-mail. (Def.'s Post-Hrg. Mem. 7-8). Ubom, using the ubomlawgroup@yahoo.com email, did in fact confirm Bile's home address to Oshinowo by email at 4:33 p.m. on July 29, 2015. (Def.'s Post-Hrg. Mem. 6-8).

Subsequently, at 6:40 p.m. on July 29, 2015, Oshinowo received another email from ubomlawgroup@yahoo.com, requesting that the consideration be wired to a particular Barclay's account. (Def.'s Post-Hrg. Mem. 2, 7-8).[9] Oshinowo believed that this email and a follow-up email that arrived shortly thereafter

---

[9] This Barclay's account was identical to the one identified in the fraudulent July 27, 2015 aoi.com account sent to ubomlawgroup@yahoo.com.

11

were sent by Ubom because of: (1) the atypical salutation (addressing Oshinowo by a shortened form of his family name, "Posi," and Mago by Mago's given name) was typical of the form of address used in Ubom's previous emails; (2) the content of the email was consistent with Ubom's error-prone typography;[10] (3) the email reiterated Bile and Ubom's demand for urgent payment;[11] (4) instructions by email were consistent with Ubom's prior statement by phone that he would confirm details via email; and (5) the attorneys in the case had communicated both by phone and email throughout the case. (Def.'s Post-Hrg. Mem. 8, 18; Pl.'s Post-Hrg. Resp. 7, 9).[12] Melczer also testified that the header information in the email demonstrated that the email authentically came from Yahoo's servers, meaning that: (1) the

---

[10] In pre-hearing briefs, Bile argued that Oshinowo should have been on notice that the email came from a malicious third party because of the numerous typographical emails in the emails sent the evening of July 29, 2015. The Court, having read Ubom's briefing and several emails genuinely sent by Ubom, concurs with Defendants that the typographical errors are characteristic of Ubom's practice, and made it more, rather than less, reasonable for Oshinowo to believe that the emails sent by the malicious third party actually originated with Ubom. (E.g., Def.'s Post-Hrg. Mem. 8).

[11] As Lemmert testified, a wire transfer was faster than processing a check for $63,000.00. (Def.'s Post-Hrg. Mem. 9).

[12] Bile "failed to present any evidence to impeach or rebut Defendants' evidence regarding the authenticity of the e-mail requesting a wire transfer, and the reasonableness of Mr. Oshinowo's assessment based on the surrounding circumstances." (Def.'s Post-Hrg. Mem. 8-9).

email actually came from ubomlawgroup@yahoo.com and was sent by someone with access to the ubomlawgroup@yahoo.com account; (2) nothing about the email's header information would have alerted Oshinowo that the email was sent by from someone other than Ubom or the Ubom Law Group;[13] and (3) industry-standard email security filters would not have alerted Oshinowo to be wary of this email. (Def.'s Post-Hrg. Mem. 7, 18; Pl.'s Post-Hrg. Resp. 8).[14] The Court finds Melczer's expert opinions to be reliable and credible.

Oshinowo, believing that the email came from Ubom and that the email reflected Ubom and Bile's desire that Bile receive payment by the most expeditious method, initiated LeClairRyan's internal procedures for sending a $63,000.00 wire transfer to the account specified. (Def.'s Post-Hrg. Mem. 9, 18-19; Pl.'s Post-Hrg. Resp. 10). Lemmert testified, and Plaintiff did not rebut, that: (1) the wire transfer was initiated according to the instructions in the July 29, 2015 6:40 p.m. email from ubomlawgroup@yahoo.com; (2) the recipient name on the wire

---

[13] The ubomlawgroup@yahoo.com account is shared by all employees of the Ubom Law Group.

[14] "[T]here is no factual dispute that Defendants had no ability or reason to believe the requests set forth in the July 29, 2015 e-mail were anything other than legitimate requests from opposing counsel – coming from precisely the same email address that opposing counsel used to communicate with Defendant seven prior to the commencement of this action." (Def.'s Post-Hrg. Mem. 2).

transfer order was Amangoua J. Bile; and (3) per banking industry standard practices, the receiving bank confirmed that the recipient name on the wire transfer order corresponded to the name of the holder of the recipient account. (Def.'s Post-Hrg. Mem. 9, 18-19; Pl.'s Post-Hrg. Resp. 10). Lemmert authenticated, and Defendants successfully introduced into evidence, receipts showing that LeClairRyan completed a wire transfer for $63,000.00 according to the instructions in the July 29, 2015 6:40 p.m. ubomlawgroup@yahoo.com email. (Def.'s Post-Hrg. Mem. 9, 18-19). Bile does not dispute that LeClairRyan completed the wire transfer for $63,000.000 according to the instructions in the July 29, 2015 6:40 p.m. email from ubomlawgroup@yahoo.com. (Pl.'s Post-Hrg. Resp. 1).

On July 31, 2015, Bile called Ubom to complain that, although Bile had received by mail a check for $2,000.00-less-witholding, the remaining $63,000.00 had not been delivered. Ubom raised the matter with Oshinowo, who informed Ubom that the money had been wired as instructed by the July 29, 2015, 6:40 p.m. email from ubomlawgroup@yahoo.com. Ubom denied that he or anyone in his office sent the July 29, 2015, 6:40 p.m. email from ubomlawgroup@yahoo.com.

## D. Aftermath

Following the discussion with Ubom, Oshinowo and LeClairRyan immediately attempted to recall the $63,000.00 wire transfer, but were unsuccessful.

On July 31, 2015, Oshinowo informed Ubom that Defendants, through LeClairRyan or otherwise, would not make another $63,000.00 payment; Defendants have not made another $63,000.00 payment. (Pl.'s Post-Hearing Resp. 1, 13-14). Ubom informed Oshinowo that Bile would not dismiss the action; Bile has not dismissed the action. (Def.'s Post-Hrg. Mem. 12, 25; Pl.'s Post-Hrg. Mem. 2). The dispute came before the Magistrate Judge, who ultimately ordered a criminal investigation by the United States Attorney for the Eastern District of Virginia. (Docket No. 40). While the dispute was before the Magistrate Judge, Defendants learned for the first time that on July 27, 2015 Bile had received a fraudulent aoi.com email requesting a wire transfer to the same Barclay's address to which LeClairRyan wired the $63,000.00.

The Court understands, and the parties seem to agree, that the same malicious party who sent the July 27, 2015 aoi.com email to ubomlawgroup@yahoo.com also sent the July 29, 2015 6:40 p.m. email from ubomlawgroup@yahoo.com to Oshinowo. The Court further understands, and the parties seem to agree, that this malicious third party controlled the Barclay's account to which

both emails referred and to which LeClairRyan wired the $63,000.00, and that this malicious third party transferred or withdrew the $63,000.00 prior to LeClairRyan's claw back attempt.

## CONCLUSIONS OF LAW

Guided by general contract principles and by the persuasive authority of Article 3 of the U.C.C., the Court concludes that Defendants substantially performed their obligations under the Settlement Agreement on July 29, 2015, and are entitled to specific performance of Bile's obligations under the Settlement Agreement.

## A.  Burden of Proof, Jurisdiction, and Choice of Law

It is well-settled that when the validity of a Settlement Agreement is questioned, the standard of proof is preponderance of the evidence. Hensley v. Alcon Labs., Inc., 277 F.3d 535, 540-41 (4th Cir. 2002). This case, however, includes issue of both validity and performance. The parties both propose (Def.'s Post-Hrg. Mem. 11; Pl.'s Post-Hrg. Resp. 12) and the Court concurs that the default civil burden, preponderance of the evidence, is the appropriate standard for performance of a Settlement Agreement. (Def.'s Post-Hrg. Mem. 11) (relying on Richardson v. Cabarrus Ct. Bd. of Educ., 151 F.3d 1030 (4th Cir.

16

1998); Stvens v. Abbot, Proctor & Paine, 288 F. Supp. 836, 847-48 (E.D. Va. 1968)).

This Court has jurisdiction over disputes arising out of the Settlement Agreement because the Court's continuing jurisdiction was included in the Settlement Agreement from which the dispute arose. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 382 (1994); Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co., 203 F.3d 291, 299 (4th Cir. 2000).

The Settlement Agreement lacks a choice of law clause, and the parties dispute whether federal common law or state law governs an agreement settling a federal cause of action. (Def.'s Post-Hrg. Mem. 10; Pl.'s Post-Hrg. Mem. 12). This issue is not perfectly clear as a matter of Fourth Circuit or district precedent,[15] but the Court need not resolve the matter because

---

[15] The trend tends to be that, where a Settlement Agreement settles federal claims, it is governed by federal common law. U.S. ex rel. Ubl v. IIF Data Sols., 650 F.3d 445, 451 (4th Cir. 2011) ("The enforceability of an agreement to settle claims under the FCA is governed by federal common law" which is informed by the Restatement (Second) of Contracts) (relying on Pinchback v. Armistead Homes Corp., 907 F.2d 1447, 1453 (4th Cir.1990)); Silicon Image, Inc. v. Genesis Microchip, Inc., 271 F. Supp. 2d 840, 848 (E.D. Va. 2003) (relying largely on Gamewell Mfg., Inc. v. HVAC Supply, Inc., 715 F.2d 112, 115 (4th Cir. 1983)).

However, the Fourth Circuit has recently acknowledged that the law on this matter is not absolutely clear. Swift v. Frontier Airlines, Inc., No. 15-1261, 2016 WL 80580, at *3, n.* (4th Cir. Jan. 7, 2016) (noting defendant's assertions of legal ambiguity on the choice of law issue, but ignoring the issue because state law would inform federal law regardless). Additionally, Gamewell's analysis may have been "eroded by

the principles governing this case are settled contract principles exposited in both federal common law and state law. E.g., Hilb Rogal & Hobbs Co. v. Rick Strategy Partners, Inc., 2006 WL 5908727, at *11 (E.D. Va. Feb. 10, 2006) (finding that an inquiry into choice of law is only necessary if potential sources of law lead to conflicting results).

**B. Common Law Contract Principles, Supplemented with Uniform Commercial Code Rules, Provide the Most Appropriate Approach for Analyzing Entitlement to Enforce the Settlement Agreement**

There is no case law precisely on point for analyzing this case. However, a combination of common law contract principles and principles from Article 3 of the U.C.C. compel the conclusion that Defendants substantially performed under the Settlement Agreement, and thus are entitled to substantial performance from Bile under the Settlement Agreement.

### 1. Common Law Supplies Principles of Material Breach and Substantial Performance

The Restatement (Second) of Contracts states that "it is a condition of each party's remaining duties to render performance ... that there be no uncured material failure by the other party to render any such performance due at an earlier time." Restatement § 237; see also U.S. ex rel. Ubl v. IIF Data Sols.,

___

subsequent Supreme Court cases [to the extent that it] is inconsistent with contemporary doctrine" on the role of federal common law. Morton Denlow & Jonny Zajac, Settling the Confusion: Applying Federal Common Law In Settlement Enforcement Proceedings Arising Under Federal Claims, 107 **Northwestern U. L. Rev.** 127, 146 & 146 n.147 (2012).

650 F.3d 445, 451 (4th Cir. 2011) ("When applying federal common law to contract issues, courts generally look to the Restatement for guidance."); Horton v. Horton, 254 Va. 111, 115, 487 S.E.2d 200, 203-04 (1997) (reciting common law principles of material breach); Culpeper Reg'l Hosp. v. Jones, 64 Va. App. 207, 213, 767 S.E.2d 236, 239 (2015) (connecting the common law rule stated in Horton with Restatement § 237). The converse of "material failure" is "substantial performance." E.g., Restatement § 241 cmt. d; see also S. Auburn L.P. v. Old Auburn Mills, L.P., No. 24210, 2005 WL 1995433, at *5 (Va. Cir. Ct. Aug. 18, 2005); RW Power Partners v. Virginia Electric and Power Co., 899 F.Supp. 1490, 1496-97 (E.D. Va. 1995). The material provision of the Settlement Agreement is the underlying exchange: Bile's dismissal of the action in exchange for $63,000.00 in damages and $2,000-less-witholding from Defendants, and vice versa. If one party materially breached the Settlement Agreement, then that party did not substantially perform and is not entitled to compel reciprocal performance.

In determining whether a failure to render performance is material, the following circumstances are significant:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

19

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement § 241; S. Auburn L.P., 2005 WL 1995433, at *5 (applying Restatement § 241); RW Power Partners, 899 F.Supp. at 1496-97 (same); see also Restatement § 241 cmt. f ("A party's adherence to standards of good faith and fair dealing ... will not prevent his failure to perform a duty from amounting to a breach .... Nor will his adherence ... necessarily prevent his failure from having the effect of the non-occurrence of a condition").[16]

There can be no question that the common law principles embodied in the Restatement (Second) of Contracts are applicable to this proceeding: the dispute is one of contract performance, and the relevant Restatement principles have been incorporated into both federal common law and Virginia state common law. However, these common law contract principles provide minimal guidance on how to resolve the facts at hand. Therefore, it is

---

[16] "Good faith and fair dealing" is not the same concept as "ordinary care." Compare Uniform Commercial Code § 3-103(6) (defining good faith) with § 3-103(9) (defining ordinary care).

necessary to look further afield to related and persuasive areas of law to aid the decisional process.

### 2. The U.C.C. Approach Provides Guidance on Reasonableness and Performance

Article 3 of the U.C.C. and cases analyzing that title provide rules and analogous situations which are useful in assessing the propriety of the parties' conduct. Although Article 3 by its terms governs only negotiable instruments, not contract disputes or wire transfers,[17] Article 3 is persuasive in areas of law which it does not directly govern. E.g., Old Stone Bank v. Tycon I Bldg. Ltd. P'ship, 946 F.2d 271, 273 (4th Cir. 1991) ("While the UCC does not of course govern the outcome of this suit involving real property, both sides agree that it provides persuasive authority in these circumstances").[18] In the absence of contract law directly on point, the Court finds that Article 3 provides guidance for the resolution of this case.

U.C.C. § 3-420 states that, where a check is intercepted by a fraudster, the intended payee has no cause of action for conversion because "if [a] check is never delivered to the

---

[17] Wire transfers are explicitly governed by Article 4 of the U.C.C., not Article 3's rules for negotiable instruments. U.C.C. §§ 3-102, 4A-104. Because the last communication legitimately sent by Ubom requested a check, however, the Court looks to Article 3 rather than Article 4 for persuasive rules.

[18] The Court solicited the parties' views on whether Article 3 might be used as a persuasive authority, and both parties agreed that Article 3 is persuasive. (E.g., Docket Nos. 69, 70, 71).

payee, the obligation owed to the payee is not affected ....
Since the payee's right to enforce the underlying obligation is
unaffected by the fraud of the thief, there is no reason to give
any additional remedy to the payee." U.C.C. § 3-420 cmt. 1. The
U.C.C. comment goes on to note that "[t]he payee receives
delivery when the check comes into the payee's possession, as
for example when it is put into the payee's mailbox." Id.[19] Taken
together, these sections teach that, if a payor issues an
instrument but fails to deliver the instrument to the payee's
possession, then the payor is still liable on the underlying
obligation.

However, §§ § 3-404 and 3-406, addressing third party fraud
and depositing checks at a bank, inject into this equation the
principle that a party whose failure to take ordinary care
results in loss must be the party to bear that loss. Per § 3-
304,

> (a) If an impostor ... induces the issuer of
> an instrument to issue the instrument to the
> impostor ... by impersonating the payee of
> the instrument or a person authorized to act
> for the payee, an indorsement of the
> instrument by any person in the name of the
> payee is effective as the indorsement of the
> payee in favor of a person who, in good
> faith, pays the instrument or takes it for
> value or for collection ....

---

[19] Additionally, "[d]elivery to an agent is delivery to the
payee." Id.

> (d) With respect to an instrument to which subsection (a) ... applies, <u>if a person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss</u> resulting from payment of the instrument, <u>the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss</u>.

U.C.C. § 3-404 (emphasis added). Comment 3 provides the following example:

> Thief, who is not an employee or agent of Corporation, steals check forms of Corporation. John Doe is president of Corporation and is authorized to sign checks on behalf of Corporation as drawer. Thief draws a check in the name of Corporation as drawer by forging the signature of Doe. Thief makes the check payable to the order of Supplier Co. with the intention of stealing it. Whether Supplier Co. is a fictitious person or a real person, Thief becomes the holder of the check and the person entitled to enforce it .... Thief deposits the check in an account in Depositary Bank which Thief opened in the name "Supplier Co." ... Depositary Bank becomes the holder of the check and the person entitled to enforce the check. If the check is paid by the drawee bank, there is no breach of warranty under Section 3-417(a)(1) or 4-208(a)(1) because Depositary Bank was a person entitled to enforce the check when it was forwarded for payment and, unless Depositary Bank knew about the forgery of Doe's signature, there is no breach of warranty under Section 3-417(a)(3) or 4-208(a)(3). Because the check was a forged check the drawee bank is not entitled to charge Corporation's account unless Section 3-406 or Section 4-406 applies.

23

U.C.C. § 3-404.

Taken together, these provisions establish a principle that a blameless party is entitled to rely on reasonable representations, even when those reasonable representations are made by fraudsters. Additionally, § 3-406 establishes that

> (a) A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.

> (b) Under subsection (a), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

> (c) Under subsection (a), the burden of proving failure to exercise ordinary care is on the person asserting the preclusion. Under subsection (b), the burden of proving failure to exercise ordinary care is on the person precluded.

U.C.C. § 3-406. "Substantially contributes" "is meant to be less stringent than a "direct and proximate cause" test. U.C.C. § 3-406 cmt. 2. "Under the less stringent test the preclusion should be easier to establish. Conduct 'substantially contributes' to a material alteration or forged signature if it is a contributing

24

cause of the alteration or signature and a substantial factor in bringing it about." Id.

Notably, Article 3 does not define what constitutes "ordinary care," and instead calls for a determination of ordinary care based on "the circumstance of the particular case." Those circumstances include any applicable commercial standard.

> No attempt is made to define particular conduct that will constitute "failure to exercise ordinary care ..." Rather, "ordinary care" is defined in Section 3-103(a)(7) in general terms. The question is left to the court ... for decision in light of the circumstances in the particular case including reasonable commercial standards that may apply.

U.C.C. § 3-406 cmt. 1. Section § 3-103(a)(7) is, indeed, quite general: "'[o]rdinary care' in the case of a person engaged in business means observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." Article 3 does, however, provide illustrative examples about cashing checks.

> *Case #1.* Employer signs checks drawn on Employer's account by use of a rubber stamp of Employer's signature. Employer keeps the rubber stamp along with Employer's personalized blank check forms in an unlocked desk drawer. An unauthorized person fraudulently uses the check forms to write checks on Employer's account. The checks are signed by use of the rubber stamp. If

25

Employer demands that Employer's account in
the drawee bank be recredited because the
forged check was not properly payable, the
drawee bank may defend by asserting that
Employer is precluded from asserting the
forgery. The trier of fact could find that
Employer failed to exercise ordinary care to
safeguard the rubber stamp and the check
forms and that the failure substantially
contributed to the forgery of Employer's
signature by the unauthorized use of the
rubber stamp.

*Case #2.* An insurance company draws a check
to the order of Sarah Smith in payment of a
claim of a policyholder, Sarah Smith, who
lives in Alabama. The insurance company also
has a policyholder with the same name who
lives in Illinois. By mistake, the insurance
company mails the check to the Illinois
Sarah Smith who indorses the check and
obtains payment. Because the payee of the
check is the Alabama Sarah Smith, the
indorsement by the Illinois Sarah Smith is a
forged indorsement. Section 3-110(a). The
trier of fact could find that the insurance
company failed to exercise ordinary care
when it mailed the check to the wrong person
and that the failure substantially
contributed to the making of the forged
indorsement. In that event the insurance
company could be precluded from asserting
the forged indorsement against the drawee
bank that honored the check.

U.C.C. § 3-406 cmt. 3. In sum, the U.C.C. requires "ordinary

care" by participants in financial transactions; the participant

who fails to exercise ordinary care is liable for any losses to

which his lack of ordinary care substantially contributes.

Combining several of these concepts, in Barrett Business

Services, Inc. v. Worker's Comp. Appeals Bd., 204 Cal. App. 4th

597 (2012), the court held that where: (1) employee's attorney
sent employer's claims adjuster a notification of employee's
change of address; (2) employer's claims adjuster did not update
employee's address; (3) employer's claims adjuster sent worker's
compensation check to employee's old address; and (4) a third
party fraudulently cashed the worker's compensation check, the
employer was still obligated to pay its employee. Id. at 600-603
("where the issuer ... does not deliver the check to the payee
... the issuer remains liable to the payee on the underlying
obligation.") (relying on California's statutory implementation
of U.C.C. § 3-420).[20] By contrast, in Willis v. Wells Fargo Bank,
N.A., No. 2:11CV193, 2012 WL 112942 (E.D. Va. Jan. 12, 2012),
the court held that, where an agent of a business who was also
an authorized drawer on the business's account lied to the bank,
but the bank adhered to Article 3 best practices and made no
error of its own, the injured third party to whom a bad check
was given had no claim against the bank. A synthesis of the
pertinent U.C.C. provisions, Barrett, and Willis yields a rule
that: if a person has an obligation to deliver a check, and does

---

[20] Contrary to Bile's assertion (Pl.'s Post-Hrg. Resp. 20),
Barrett does not stand for the proposition that a defendant is
liable on any check which is not delivered to its intended
recipient. Rather, Barrett more properly stands for the
principle that a party which acts without ordinary care bears
the loss associated with the intervention of a malicious third
party. Barrett, 204 Cal. App. 4th at 603.

not deliver that check due to that person's own error, then that person remains liable on the underlying obligation.

In this case, application of this principle means that: if Defendants' agent, LeClairRyan, issued the wire transfer pursuant to Defendants' agent's own error or Defendants' agent's lack of ordinary care, then Defendants remain liable on the underlying obligation. U.C.C. § 3-420 cmt. 1. Conversely, if Bile's agent, Ubom, caused the wire transfer to be issued pursuant to Bile's agent's own error or Bile's agent's lack of ordinary care, then Bile is not entitled to collect on the underlying obligation. Id. Defendants remain liable on the underlying obligation if the transfer of funds can be described as Defendants' agent's error rather than Bile's agent's error.

> ### 3. Combining Common Law Contract Principles with Applicable Precepts of Article 3 Yields a Functional Roadmap for Assessing Entitlement to Enforce the Settlement Agreement

The utility of the common law contracts approach and the Article 3 approach is best aggregated by nesting Article 3 principles within Restatement § 237. This approach yields a two-step rule: (1) "it is a condition of each party's remaining duties to render performance ... that there be no uncured material failure by the other party to render any such performance due at an earlier time" (Restatement § 237); and (2) the parties' material failure (or its converse, substantial

28

performance) shall be determined by examining whether they acted in accord with principles of ordinary care as characterized in U.C.C. § 3-404 and § 3-406.

Accordingly, the Court proceeds to examine whether the parties acted with principles of ordinary care as characterized in U.C.C. § 3-404 and § 3-406.

## C.   Bile's Agent, Ubom, Failed to Exercise Ordinary Care

Bile's agent, Ubom, failed to use ordinary care under the circumstances. That failure substantially contributed to the $63,000.00 loss in this case.

The parties have cited no decision articulating that an attorney has an obligation to notify opposing counsel when the attorney has actual knowledge that a third party has gained access to information that should be confidential, such as the terms of a settlement agreement, or the attorney has knowledge that the funds to be paid pursuant to a settlement agreement have been the target of an attempted fraud. Nor has the Court located such authority. However, the principle is an eminently sensible one. Indeed, Bile's briefing clearly considers that to be the case because Bile states, repeatedly, that attorneys have "an obligation to contact [opposing] counsel when and if they receive[] suspicious emails instructing [them] to wire settlement funds to a foreign country where such [a] request has never been made during the course of performance of the

29

parties." (E.g., Pl.'s Post-Hrg. Resp. 3, 23). Ubom repeated this argument orally during the evidentiary hearing. Applying this standard, Ubom failed to act with the ordinary care that he, correctly, says should govern this case.

Two days before the fraud was perpetrated on LeClairRyan, both Ubom and Bile were aware that an unidentified third party had targeted the settlement funds for diversion to a Barclay's bank account that had nothing to do with Bile. Additionally, Bile and Ubom knew that ubomlawgroup@yahoo.com was being used in an effort to perpetrate the fraud. Ubom failed to pass this information along to Defendants, defense counsel, or the Court. This failure substantially contributed to the loss of $63,000.00 within the meaning of U.C.C. § 3-406. The Court finds it self-evident that if Oshinowo or Mago was aware: (1) that the settlement funds were the target of a malicious third party; (2) that the terms of the confidential Settlement Agreement had been accessed by a malicious third party; or (3) that a malicious third party was angling to redirect the settlement funds to a Barclay's account when Bile had no such account, then Oshinowo would not have initiated the wire transfer on July 29, 2015.

Because Ubom failed to observe the ordinary care that he himself states is the standard for the practice of law, and because that failure substantially contributed to the loss, the principles developed in the U.C.C. and associated case law

30

provide that Bile must bear the loss associated with the malicious third party behavior. E.g., U.C.C. §§ 3-404, 3-406, 3-420; Barrett, 204 Cal. App. 4th at 603; Willis, 2012 WL 112942, at *1.

Bile attempts, incorrectly, to defend his behavior by vague references to law enforcement and industry advisories which were not introduced to the record. (Pl.'s Post-Hrg. Resp. 3, 11, 20) ("the advisory from this Court, the FBI, ABA and [] every State Bar advises that one should delete any suspected fraudulent emails without opening them; as such[,] Counsel deleted that fraudulent email when Plaintiff confirmed he did not send it."). Because the advisories are not in the record, Bile's argument simply fails for lack of proof.

Moreover, it appears that such advisories simply do not say what Bile claims they say. In 2011, the American Bar Association republished an advisory from the California Bar Association regarding an increasingly common scam by which: (1) a prospective client, typically foreign, would solicit an attorney for legal representation against another party; (2) the prospective client would inform the attorney that the other party had capitulated and would mail the attorney a settlement check, and request that the attorney wire the funds (less attorney's fees) to the client; (3) the attorney would cash the check and wire the funds to the client; (4) the bank would

31

determine that the check was counterfeit; and (5) the attorney would be liable for the wired funds. Internet Scams Targeting Attorneys, **State Bar of California Ethics Hotline** (Jan. 2011), http://www.americanbar.org/content/dam/aba/administrative/profes sional_responsibility/6_combined_session_documents.authcheckdam. pdf. This advisory did conclude that "[h]itting the delete button may be the best course of action for the attorney" upon solicitation from suspicious and unknown clients. Id. at 6. The FBI released an advisory regarding a similar scam. New Twist on Counterfeit Check Schemes Targeting U.S. Law Firms, **Federal Bureau of Investigations** (accessed Jul. 27, 2016) https://www2.fbi.gov/cyberinvest/escams.htm.[21]    The Eastern District of Virginia has not issued a warning about email scams targeting attorneys in the past three years. Scam Alerts, **United States District Court for the Eastern District of Virginia**

---

[21] The type of scam referenced in the State Bar of California and FBI advisories has also led to litigation between attorneys and their banks. E.g., Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 795 (2d Cir. 2011); Simmons, Morris & Carroll, LLC v. Capital One, N.A., 49,005 (La. App. 2 Cir. Jun. 27, 2014); Mechanics Bank v. Methven, No. A136403, 2014 WL 4479741 (Cal. Ct. App. Sept. 12, 2014); Greenberg, Trager & Herbst, LLP v. HSBC Bank USA, 17 N.Y.3d 565, 571, 958 N.E.2d 77, 79 (2011); Bank One, NA v. Dunn, 40,718, 927 So. 2d 645 (La. App. 2 Cir. Apr. 12, 2006); O'Brien & Wolf, LLP v. Associated Banc-Corp, No. 11-CV-1253 SER, 2013 WL 1104641 (D. Minn. Mar. 18, 2013); Branch Banking & Trust Co. v. Witmeyer, No. 3:10CV55-HEH-DWD, 2011 WL 3297682, at *1 (E.D. Va. Jan. 6, 2011); PNC Bank, NA v. Martin, No. CIV.A 08-649-JBC, 2010 WL 3271725 (W.D. Ky. Aug. 19, 2010); JP Morgan Chase Bank, N.A. v. Cohen, 26 Misc. 3d 1215(A), 907 N.Y.S.2d 101 (Sup. Ct. 2009).

(accessed           Jul.           27,           2016),
http://www.vaed.uscourts.gov/notices/SCAM%20ALERTS.pdf. The ABA
and FBI advisories encourage attorneys to be wary of accepting
clients who only communicate by email and to avoid wiring money
on behalf of those clients; to this end, the advisories do
encourage attorneys to delete emails from new and suspicious
clients. The advisories say nothing about deleting emails which
indicate that a third party is attempting to perpetrate fraud in
connection with an ongoing case, and the Court can find no
advisories which stand for such a proposition. In conclusion,
Bile misstates the industry and law enforcement advisories on
which he relies. Read more properly, these advisories do not
make Ubom's deletion of the July 27, 2015 email without
notifying opposing counsel reasonable.

## D.    Defendants' Agents Exercised Ordinary Care

Meanwhile, Defendants' agents violated neither the
principle that attorneys must notify opposing counsel when they
have actual knowledge of attempted fraud nor industry and law
enforcement advisories regarding attorneys, fraud, and wire
transfers. First, unlike Ubom - who called Bile and thus knew
that the July 27, 2015 email from the aoi.com account was
fraudulent - Oshinowo did not know or have any reason to suspect
that the July 29, 2015 6:40 p.m. email from
ubomlawgroup@yahoo.com was fraudulent until he spoke with Ubom

33

on July 31, 2015, at which point it was too late to prevent the fraud. Second, the industry and law enforcement advisories relating to attorneys, scams, and wire transfers are, as noted, inapplicable to this situation. Sending a wire transfer to a known defendant on behalf of a known client is not the same as receiving a check from an unknown defendant and wiring funds to an unknown client.

Nor did Defendants' agents act contrary to best practices in funds transfers. Bile states, repeatedly, variations on "[a] phone call verification of any wire transfer especially to a foreign country is what is advised and recommend[ed] by the banks, FBI, ABA, and State [Bars]." (Pl.s Post-Hrg. Resp. 3-4, 8, 11, 19, 21). As with the scam advisories on which Bile attempts to rely, these phone verification advisories are not in the record, and thus this argument also fails for lack of proof.

Moreover, Bile again misstates the content of such advisories. The FBI did release an advisory on scams in which a fraudster mimics the identity of a person and then requests a wire transfer. Business E-mail Compromise, **Federal Bureau of Investigation** (Jan. 22, 2015), https://www.ic3.gov/media/2015/150122.aspx.[22]   However,   that

---

[22]   Suggestions that businesses should employ two-factor authentication to ensure that only authorized persons initiate wire transfers, e.g., Choice Escrow & Land Title, LLC v. BancorpSouth Bank, 754 F.3d 611 (8th Cir. 2014), are

advisory suggested corroborating requests to ensure validity and screening emails for proper digital signatures. In this case, screening for proper digital signatures would not have helped Oshinowo because the malicious third party had access to Ubom's actual email account, ubomlawgroup@yahoo.com. Additionally, the wire transfer request was partially corroborated: unlike typical business email compromise scams, which request a wire transfer for a payment which was previously wholly uncontemplated, this request redirected a pre-existing payment request, and that pre-existing payment request had been discussed via phone as well as email.

This is not to say that Oshinowo might not have exercised greater care when he received the email directing the settlement funds to an overseas bank account. However, Article 3 does not require best practices: it requires ordinary care, and there is no proof that LeClairRyan did not exercise ordinary care.

At the heart of this case is the simple fact that Bile's agent, Ubom, could have prevented the loss of $63,000.00 by notifying opposing counsel on July 27, 2015 when he had actual knowledge of an attempted fraud, the known purpose of which was to lay hands on the settlement funds. As technology evolves and fraudulent schemes evolve with it, the Court has no compunction

inapplicable here, because the LeClairRyan employee who initiated the wire transfer, Lemmert, was an authorized person who would have had legitimate access to both factors.

in firmly stating a rule that: where an attorney has actual knowledge that a malicious third party is targeting one of his cases with fraudulent intent, the attorney must either alert opposing counsel or must bear the losses to which his failure substantially contributed.

The Court concludes that Defendants substantially performed their obligations under the Settlement Agreement when they completed the wire transfer of $63,000.00. In so doing, they acted with ordinary care. Because Defendants substantially performed on or about July 29, 2015, Defendants are entitled to compel enforcement of the Settlement Agreement. (Cf. Pl.'s Post-Hrg. Resp. 17-20).

Because Defendants substantially performed on or about July 29, 2015, Defendants could not have committed an anticipatory breach when Oshinowo communicated to Ubom on July 31, 2015 that Defendants would not pay out another $63,000.00, nor did Defendants engage in the first (or any) material breach. (Cf. Pl.'s Post-Hrg. Mem. 14-17, 24-28). Because Defendants substantially performed, Bile cannot demand specific performance which would compel Defendants to repeat their substantial performance.

**CONCLUSION**

For the reasons set forth above, Defendants substantially performed their obligations under the Settlement Agreement on or about July 29, 2015, and Defendants are entitled to compel reciprocal performance from Bile. Therefore, Defendants' MOTION FOR SETTLEMENT ENFORCEMENT (Docket No. 51) will be granted and Plaintiff's MOTION TO ENFORCE SETTLEMENT AGREEMENT (Docket No. 54) will be denied. An order dismissing the case with prejudice will be entered.

It is so ORDERED.

_____ /s/ _____ _REP_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August **24**, 2016